# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Stephen Pascal, Chris Gates, and Barbara Burns, | : | |
| Appellants | : | |
| | : | |
| v. | : | No. 337 C.D. 2019 |
| | : | Argued: October 3, 2019 |
| City of Pittsburgh Zoning Board of Adjustment, James Street Parking LLC, Sean Lange and Morgan Kronk, and City of Pittsburgh and James Street Parking, LLC | : | |

BEFORE:     HONORABLE RENÉE COHN JUBELIRER, Judge
            HONORABLE ANNE E. COVEY, Judge
            HONORABLE ELLEN CEISLER, Judge


**OPINION NOT REPORTED**


**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**                    **FILED: April 8, 2020**


Stephen Pascal (Pascal), Chris Gates (Gates), and Barbara Burns (Burns) (collectively, Objectors) appeal from an Order of the Court of Common Pleas of Allegheny County (common pleas) dated February 5, 2019, which affirmed the Decision of the City of Pittsburgh Zoning Board of Adjustment (Board) granting James Street Parking, LLC (Applicant) two special exceptions, two variances, and a modification of a previous zoning decision issued by the Board. On appeal, Objectors generally argue that the Board erred in granting the above relief. Upon review, we affirm.

## I. Factual Background and Procedure

### A. Zoning Application

Applicant owns and operates a parking lot (Parking Lot or Lot) located at 713-719 James Street, Pittsburgh, Pennsylvania. In 1998, a previous owner of the Parking Lot applied for and received a Certificate of Occupancy from the City of Pittsburgh (City) to operate the Parking Lot as a "Sixteen (16) Stall Residential Community Parking Lot." (Reproduced Record (R.R.) at 76a.) In 2018, Applicant filed an application (Application) seeking to "re-stripe existing parking lot to expand accommodation from 16 to 23 stalls." (*Id.* at 45a.)

### B. Board Hearing

The Board scheduled a public hearing on the Application for April 11, 2018. The "Notice of Public Hearing" advertised that Applicant sought to "[r]e-stripe existing parking lot to expand accommodation from 16 to 23 stalls" and that "[e]nlargement of an existing commercial parking [lot] is a [s]pecial [e]xception." (*Id.* at 48a.)

At the hearing, two architects, Sean Lange (Lange) and Morgan Kronk (Kronk), testified on behalf of Applicant by answering questions posed by members of the Board. Lange testified that the Parking Lot, while only approved for 16 spaces, is currently striped for 24 spaces. (*Id.* at 446a.) He stated that Applicant proposes restriping the Parking Lot to reduce the number to 23 parking spaces, including a handicap accessible space and two bicycle spaces. In addition to the restriping, Lange stated that Applicant also seeks review of whether lighting is permitted at the Parking Lot. (*Id.* at 448a-49a.) Lange acknowledged that in 1998 the Board reviewed a zoning application pertaining to the Parking Lot and that, per

2

the Board's decision (1998 Decision),[1] the addition of lighting required Board approval. (*Id.*) Lange also acknowledged that, without the Board's approval, lights were added to the Parking Lot at the request of law enforcement. (*Id.*) As to the aesthetics of the Parking Lot, Lange proposed adding wrought iron fencing along the front of the Parking Lot, as well as evergreen shrubbery and trees beside the entrance to the Parking Lot. (*Id.* at 450a-51a.) Lange also proposed removing the chain link fence that runs along the back of the Parking Lot and replacing it with wood slats to help block the light produced by the headlights of cars parking in the Parking Lot. (*Id.* at 453a.) Lange emphasized that the Parking Lot would not be used for commercial parking but rather 20 of the 23 spaces would be leased by two nearby apartment buildings because those buildings did not have "enough parking [] as was needed." (*Id.* at 451a-52a.) Lange also testified that the certificates of occupancy of the two apartment buildings was tied to their use of the Parking Lot. (*Id.* at 452a.)

Kronk testified that the Application is merely a request to restripe the Parking Lot to provide for 23 spaces, that the size of the Lot would not increase, and that the Parking Lot would continue as a "residential parking lot for residential use." (*Id.* at 440a-41a.) With regard to whether the proposed use of the Parking Lot is commercial in nature, the Zoning Case Administrative Officer (Zoning Officer) asserted at the hearing that there was a "misunderstanding with how the City is using commercial here," as "[t]he City defines commercial [] broadly." (*Id*. at 443a-44a.) The Zoning Officer concluded that because the Parking Lot "is part of a lease arrangement not tied to one single owner, but several buildings, several residential uses, it's still considered commercial." (*Id*. at 444a.) In response, Kronk stated

_____

[1] The Board's 1998 Decision is located at pages 367a-71a of the Reproduced Record.

3

"[t]hat's the understanding that we have of the commercial use." (*Id.*) Like Lange, Kronk also testified that use of the Parking Lot was tied to the certificates of occupancy of the two apartment buildings. (*Id.* at 452a.)

At the hearing, Objectors Burns and Gates spoke in opposition to the Application. Burns, a resident of the neighborhood where the Parking Lot is located and an owner of a business in the area, noted that the notice of the hearing stated its purpose was to consider the expansion of a commercial parking lot. However, Burns asserted, pursuant to prior litigation, the Parking Lot cannot be utilized for commercial parking. (*Id.* at 456a-60a.) However, Burns acknowledged that she understands the Parking Lot is intended to be used as "a residential lot" to "support[] residential development." (*Id.* at 456a.) Burns also expressed some concerns with respect to the aesthetics of the Parking Lot. Burns acknowledged that while the proposed alterations are a "step in the right direction," she was disappointed that the proposed changes did not include replacing the cinder block pillars at the entrance of the Parking Lot with brick pillars. (*Id.*) Lastly, Burns expressed that "[s]ome of the problems the community has confronted" with the Parking Lot stem from the fact that "there is no one in charge" at the Parking Lot, that "there's no attendant there." (*Id.* at 456a-57a.)

Gates, a local resident, also expressed concerns regarding the use of the term "commercial" and whether the Parking Lot is being used commercially. Gates argued that the term "commercial" was being used "with two different definitions" and that he would appeal any "permit that includes the terminology commercial, even if it is understood within certain parts of the City that it means one thing because it could be understood otherwise." (*Id.* at 458a-59a.) Nonetheless, Gates asserted the Parking Lot is currently being used for commercial purposes. As

4

support, Gates presented pictures to the Board, which purportedly show workers from a nearby restaurant getting into vehicles parked in the Parking Lot. (*Id.* at 460a-61a.) Gates also took issue with the possibility of the Board granting Applicant variances for relief from the side and rear setback requirements set forth in the Zoning Code of the City of Pittsburgh, Pennsylvania (Code) and relief from the Code's screening requirements because "[t]here is no hardship that runs with this parcel." (*Id.* at 460a.) Gates also argued that the proposed alterations do not adequately address the issue of vehicle headlights shining into nearby homes. Further, Gates argued that the Parking Lot violates the Code in several respects, specifically that the entrance to the Parking Lot is too close to an intersection and that the Parking Lot is not fully screened from view.

After the hearing, Objectors submitted letters in opposition to the Application. In addition to the issues she raised at the hearing, Burns, in her letter, asserted that the proposed changes leave some issues unresolved. Specifically, Burns argued that pursuant to a 1996 decision by the Board (1996 Decision),[2] access to the Parking Lot is supposed to be by means of an automatic parking gate and any decision issued by the Board should maintain such a requirement because the "window sticker monitoring system is inadequate to address the problems associated with this [P]arking [L]ot." (R.R. at 109a.) Again citing the 1996 Decision, Burns argued the Board should require Applicant to construct a brick wall along the back of the Parking Lot. (*Id.*) Additionally, Burns asserted that the Board should require the aesthetics of the Parking Lot be improved in order to "enhance the architectural streetscape of the James Street corridor." (*Id.*) Further, Burns asserted that "the Board['s] decision should ensure better maintenance and security" of the Parking

---

[2] The Board's 1996 Decision is located at pages 372a-76a of the Reproduced Record.

Lot. (*Id.*) Since the Parking Lot is to be leased out to two nearby apartment buildings, Burns argued the Parking Lot should not be permitted to have a sign advertising spaces for lease. (*Id.* at 110a.) Lastly, Burns asserted that the Board should require Applicant to use "decorative and/or street level lighting" because the current wall-mounted lighting system shines outside the Parking Lot and into nearby homes. (*Id.*)

In his letter in opposition to the Application, Gates again asserted that the Parking Lot is currently being used as commercial parking. Gates asserted that pursuant to this Court's decision in *East Allegheny Community Council v. City of Pittsburgh Zoning Board of Adjustment* (Pa. Cmwlth., No. 670 C.D. 1994, filed May 22, 1995) (concluding, *inter alia*, that pursuant to the zoning ordinance in effect at that time, the then owner of the Parking Lot could not continue to utilize the Lot for commercial parking in the district in which the Lot is located), prior decisions issued by the Board, and the Code, the Parking Lot cannot be used for commercial parking. (*Id.* at 100a-01a.) As to the proposed restriping, Gates asserted that, pursuant to the Code, a nonconforming use in a residential district cannot be increased more than 15% and that the Application proposes to increase the number of spaces from 16 to 23 spaces, which is an increase of greater than 25%. (*Id.* at 101a.) Gates argued the greatest permissible increase in the number of spaces would be the addition of two spaces. (*Id.* at 102a.) Because the Application proposes to add more than two spaces, Gates concluded the proposed use of the Parking Lot violates the Code. (*Id.*) Gates also asserted that the 1996 and 1998 Decisions should not be modified to allow lighting on the Parking Lot without the submission of detailed specifications because the "needs of residential lighting are substantially different from those for

6

commercial purposes." (*Id.* at 103a.) Additionally, Gates, like at the hearing, argued that the Parking Lot violates various provisions of the Code.

Pascal, a local resident who was not present at the hearing, also submitted a letter in opposition to the Application. In his letter, Pascal, like Gates, argued that, pursuant to a prior decision from this Court and the Code, the Parking Lot cannot be utilized for commercial parking. (*Id.* at 106a.) Additionally, Pascal asserted that there is no hardship that runs with the Parking Lot and, therefore, the Board should not grant Applicant the requested variances and special exceptions. (*Id.*) Pascal concluded by stating that "[i]n order to receive the permitted increase in residential parking, the [Applicant] must bring the [Parking Lot] up to modern standards." (*Id.* at 107a).

*C. Board's Decision*

On July 26, 2018, the Board issued its Decision on the Application. The Board's Decision granted Applicant two special exceptions, two variances, and a modification of the 1998 Decision. The Board, in relevant part, made the following findings of fact:

> 1. The [Parking Lot] extends from 713 to 719 James Street in an R1A-VH (Residential Single-Unit, Very High Density) District in the East Allegheny neighborhood. Moravian Way is located at the rear of the [Parking Lot].
>
> 2. A July 19, 1998 Certificate of Occupancy permits [a] "16 stall residential commuting parking lot" and the property is currently used for a parking lot.
>
> 3. The existing [P]arking [L]ot on the property extends to all four property lines and buildings extend to the property lines on both interior sides. A 3.5' concrete block [wall], with chain-link fencing on top of it, is located on the Moravian Way property line. The fence was

7

installed as a security measure to extend the height of the barrier on that side of the [P]arking [L]ot.

4.      Access to the [P]arking [L]ot is by means of a 12' curb on James Street.  Concrete pillars are located on each side of the entrance.

5.      Lighting has been installed for the [P]arking [L]ot, mounted on the sides of the adjacent abutting buildings.

6.      The spaces within the [Parking] [L]ot are to be leased to residents of two nearby multi-residential buildings, at 500 Lockhart Street and 600 Cedar Street.  A total of 23 off-street parking spaces are required for those two developments.

7.      In [the 1998 Decision], the Board approved the [then owner's] request for variances from the Code's setback provisions to permit use of the [Parking Lot] as [a] residential community parking lot with 16 spaces, subject to the following conditions:

> a. Use shall be exclusively by residents of the neighborhood for the parking of noncommercial vehicles . . . ;
> b. Access to the [P]arking [Lot] will be by means of an automatic parking gate, and only residents of the neighborhood with leases shall have access, with leases to be made available for inspection by the community;
> c. The [P]arking [L]ot shall be kept paved, with striping and wheel stops;
> d. The constructed wall along the Moravian Way consists of 3[.5'] high concrete block with [a] 40" wide black wrought iron gate, with the gate locked at all times. Plantings shall be maintained on James Street;
> e. Applicant shall comply with the 1998 site plan;
> f. No dumpsters or trash receptacles [shall] be placed on the property except with the approval of the [z]oning [a]dministrator.  The property shall be kept free of trash;
> g. Improvements and maintenance of the property shall be subject to the review and approval [of the] [z]oning [a]dministrator; and
> h. No lighting shall be installed without approval of the Board.

8.     Although the Certificate of Occupancy allows use of the property for 16 parking spaces, the Applicant indicated that i[t] has been used for 24 spaces for a considerable period of time, within the same footprint as approved for parking in 1996.  The lighting was installed without the Board's approval.  However, the Applicant explained that it had been installed at the request of law enforcement and community officials, to address safety and security concerns.

9.     The Applicant now proposes to restripe the parking lot for 23 spaces, without altering the existing [P]arking [L]ot footprint.  The Applicant proposes to reduce the area used for parking and to provide 180 sf [(square feet)] of additional landscaping and screening.  The Applicant would also replace the deteriorating pillars at the James Street entrance with brick pillars and wrought-iron fencing to enhance the appearance of the entrance to the [L]ot[.]  The Applicant would install opaque fencing on the Moravian Way side to limit the impact of car headlights within the [L]ot.

10.    The Applicant also seeks [] review and approval of the lighting that has been installed, at the request of law enforcement and community, for safety purposes.

(Board's Decision, Findings of Fact (FOF) ¶¶ 1-10.)  Based upon the above findings of fact, the Board, in relevant part, made the following conclusions of law:

1.     The Applicant seeks a special exception pursuant to Code Section 921.02.A.1 to permit the expansion of the [P]arking [L]ot from 16 to 23 spaces, and a special exception pursuant to Code Section 914.07.G.2 to permit use of the [L]ot for off-site parking.  The Applicant also seeks variances from Section 903.03.E.2, the Code's rear and side setback requirements[,] and Section 918.03.A, the Code's screening requirement for parking lots.

2.     Additionally, the Applicant seeks approval for the lighting in the [P]arking [L]ot, and thus seeks a modification of one of the conditions the Board imposed in [] [the 1998 Decision].

3.     The Board concludes that Code Section 907.03.A, the North Side Commercial Parking Overlay District [(NSCPO)], is not applicable to the [Parking Lot] because the site is not currently vacant and the [L]ot

9

is intended for use as an accessory off-site parking for residents in the immediate vicinity and not for commercial parking.

4.     Code Section 922.09.E sets forth the general conditions the Board is to consider with respect to variances.  The Pennsylvania Supreme Court has summarized the criteria for determining whether to grant a variance as:  1) unique circumstances or conditions of a property would result in [] an unnecessary hardship; 2) no adverse effect on the public welfare; and [] 3) [the] variance proposed is the minimum variance that would afford relief with the least modification possible. *Marshall v. City of Philadelphia and Zoning Bd. of Adj[ustment]*, 97 A.3d 323, 329 (Pa. 2014); *see also Hertzberg v. Zoning Bd. of Adj[ustment] of the City of Pittsburgh*, 721 A.2d 43 (Pa. 1998)[(citing *Allegheny West Civic Council v. Zoning Bd. of Adj[ustment] of the City of Pittsburgh*, 689 A.2d 225 (Pa. 1997))].

5.     In *Hertzberg*, the Court recognized that a less restrictive standard is appropriate for dimensional variances, which require only a reasonable adjustment of the zoning regulations to accommodate a use of property that is permitted.  *Hertzberg*, 721 A.2d at 47-48.

. . .

8. The Board concludes that maintaining the existing and long-term parking lot use, with the 7 additional spaces, the expanded and improved [P]arking [L]ot will have the effect of improving neighborhood conditions through the improvement of the James Street and Moravian Way frontages.  It thus concludes that the requested special exception to allow the expansion for the nonconforming parking lot use, and the associated special exceptions for waiver of residential compatibility standards and dimensional variances are appropriate, subject to the conditions set forth below.

(*Id.*, Conclusions of Law (COL) ¶¶ 1-5, 8.)  Accordingly, the Board ordered as follows:

The Applicant's request for special exceptions to Code Sections 921.02.A.1 and 914.07.G.2; variances from Code Sections 903.03.E.2 and 918.03.A; and modification of the lighting condition in [the 1998 Decision] is hereby APPROVED, subject to the following conditions:

10

1.      The Applicant shall make improvements to the [Parking Lot], consistent with the site plan submitted to the Board, including installation of a 42" wrought-iron fence on the James Street property line; additional plantings on both the front and rear property line; and a wooden privacy fence on the Moravian Way property line;

2.      Proposed landscaping shall be approved [by] the City Planning Department, in consultation with the East Allegheny Community Council;

3.      Concrete pillars at the James Street entrance shall be replaced with brick pillars; and

4.      The 23 parking spaces will be used for residential parking only, with preference given to tenants of the properties at 600-606 Cedar Avenue and 502 Lockhart Street.

(*Id.* at 4.)


*D. Appeal to Common Pleas.*

Objectors appealed the Board's Decision to common pleas. Objectors and Applicant filed briefs, and common pleas held oral argument on January 22, 2019. Thereafter, without taking additional evidence, common pleas, by Order dated February 5, 2019, affirmed the Board's Decision. Objectors then filed the present appeal with this Court.


**II. Discussion**

On appeal,[3] Objectors generally argue that the Board erred by: (1) granting Applicant a special exception to Section 921.02.A.1 of the Code; (2) granting

---

[3] "Our scope of review where the trial court took no additional evidence is limited to determining whether the Board committed an error of law or abused its discretion. A zoning hearing board abuses its discretion only if its findings are not supported by substantial evidence."

11

Applicant a special exception to Section 914.07.G.2 of the Code; (3) granting Applicant variances from Sections 903.03.E.2 and 918.03.A of the Code; and (4) the Parking Lot violates the Code even with the relief granted by the Board.

In reviewing this matter,

> [t]his Court may not substitute its interpretation of the evidence for that of the [Board]. It is the [Board]'s function to weigh the evidence before it. The [Board] is the sole judge of the credibility of witnesses and the weight afforded their testimony. We must view the evidence in a light most favorable to the prevailing party, who must be given the benefit of all reasonable inferences arising from the evidence.

*Tidd v. Lower Saucon Twp. Zoning Hearing Bd.*, 118 A.3d 1, 13 (Pa. Cmwlth. 2015) (citations omitted).

### A. Whether the Board erred in granting Applicant a special exception to Section 921.02.A.1 of the Code.

Objectors argue the Board erred in granting Applicant a special exception to Section 921.02.A.1 of the Code. Specifically, Objectors argue[4] that Section 921.02.A.1 prohibits the enlargement of a nonconforming use in a residential district by more than 15% and since the Application proposes to increase the number of spaces in the Parking Lot from 16 to 23, an enlargement of greater than 15%, the Board erred as a matter of law in granting this special exception. Further, Objectors, citing the testimony of the Zoning Officer that the proposed use of the Parking Lot is commercial in nature, assert that the Board erred in granting this special exception because commercial parking is not permitted in the NSCPO District. As support for

*Thomason v. Zoning Hearing Bd. of Twp. of Radnor*, 26 A.3d 562, 565 n.5 (Pa. Cmwlth. 2011) (citations omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Coal Gas Recovery, L.P. v. Franklin Twp. Zoning Hearing Bd.*, 944 A.2d 832, 838 n.9 (Pa. Cmwlth. 2008).

[4] Objectors' arguments have been rearranged for ease of discussion.

their argument that the Parking Lot is commercial in nature, Objectors contend that the Parking Lot cannot be accessory parking for the two apartment buildings for two reasons. First, the Code, Objectors argue, permits off-site accessory parking for a single primary lot. Since the Parking Lot is intended to be used as accessory parking for two apartment buildings, Objectors assert the Lot cannot be construed as an accessory use. Second, Objectors, citing Lange's testimony "that only 20 of the proposed 23 spaces would be leased by the residents of" the two apartment buildings, assert that the Parking Lot is not accessory parking because three spaces will not be leased by the two apartment buildings; therefore, the Parking Lot "must be characterized as [] commercial parking" because the entirety of the Lot will not be used as accessory parking. (Objectors' Brief (Br.) at 11.) In addition, Objectors also argue that the Board ignored the fact that the Parking Lot is not in compliance with several provisions of the Board's 1998 Decision. Specifically, Objectors aver the Parking Lot does not have an automatic parking gate nor does it have wheel stops. Since the Parking Lot is not in compliance with the 1998 Decision, Objectors contend the Board erred by granting this special exception.

Applicant responds[5] by arguing that it is not clear it even needs this special exception in order to restripe the Parking Lot. Applicant contends that since its proposal does not involve increasing the footprint of the Parking Lot, and in fact proposes decreasing the Lot's footprint, this special exception is not needed. Further, Applicant argues that the proposed use of the Parking Lot is not commercial in nature, but to the extent that it is, the Lot is a preexisting nonconforming use. As such, Applicant asserts, the prohibition of commercial parking in the NSCPO District does not apply to the Parking Lot since it was already in existence.

_____

[5] The City and the Board joined in the brief filed by Applicant and Kronk.

Preliminarily, before turning to the merits of the parties' arguments, we recount the law regarding special exceptions. "A special exception is not an exception to a zoning ordinance but rather a use which is expressly permitted absent a showing of detrimental effect on the community." *Freedom Healthcare Servs., Inc. v. Zoning Hearing Bd. of City of New Castle*, 983 A.2d 1286, 1291 (Pa. Cmwlth. 2009). As such, "[a] special exception is . . . not an 'exception' to the zoning ordinance, but a use permitted conditionally, the application for which is to be granted or denied by the zoning [] board [of adjustment] pursuant to express standards and criteria." *Monroe Land Invs. v. Zoning Bd. of Adjustment*, 182 A.3d 1, 7 (Pa. Cmwlth. 2018) (quoting *In re Appeal of Brickstone Realty Corp.*, 789 A.2d 333, 340 (Pa. Cmwlth. 2001)).

The applicant for a special exception has the burden of demonstrating that a proposal meets the objective (specific) criteria set forth in a zoning ordinance. *Freedom Healthcare Servs., Inc.*, 983 A.2d at 1291. Once an applicant meets its burden, "a presumption arises that the use is consistent with the health, safety[,] and general welfare of the community." *Id.* The burden then shifts to the objectors of the proposal to demonstrate that the proposal "will have a generally detrimental effect" to health, safety, and welfare (general criteria). *Id.* "The evidence presented by [the] objectors must show a high probability that the use will generate adverse impacts not normally generated" by the specific type of proposed use, "and that these impacts will pose a substantial threat to the health and safety of the community." *Id.*

(1) Whether the Application proposes an impermissible expansion.

Objectors argue that the Application proposes to enlarge the Parking Lot by more than 15% and, therefore, the special exception should have been denied since

14

the Application proposes an impermissible expansion. Pursuant to Section 921.02 of the Code, "[a] nonconforming use which has a valid Certificate of Occupancy and lawfully occupies a structure or vacant site on the date that it becomes nonconforming may be continued as long as it remains otherwise lawful." Section 921.02.A.1 provides that "[a] nonconforming use may not be enlarged, expanded or extended **to occupy** parts of another structure or **portions of a site that it did not occupy on the date that it became nonconforming**, unless approved by the [] Board." (Emphasis added.) Specifically, the Board

> shall not allow as a special exception any enlargement, expansion or extension that has the effect of **increasing the total floor area or lot coverage of a nonconforming use** . . . by more than fifteen (15) percent in a residential zoning district, when compared to the floor area or site area coverage of the nonconforming use at the time it became nonconforming.

Section 921.02.A.1(a)(1) of the Code (emphasis added).

Here, the Application proposes restriping the Parking Lot to increase the number of spaces from 16 to 23. Objectors argue that this is an impermissible expansion because the increase in the number of spaces is greater than 15%. However, in reaching this conclusion, Objectors misinterpret Section 921.02.A.1 of the Code. The focus of that section is whether an alteration of a nonconforming use increases the **footprint** of that use. Lange and Kronk testified, and the Board specifically found, that the proposed alterations of the Parking Lot would not increase the footprint of the Parking Lot. (Board's Decision, FOF ¶ 9.) Further, the Board found that the proposed alterations to the Parking Lot would actually **decrease** the lot coverage of the Lot. (*Id.*) Significantly, the Board also found that "[t]he existing [P]arking [L]ot on the property extends to all four property lines." (*Id.*, FOF ¶ 3.) As such, it would be impossible for the Parking Lot to be enlarged, expanded,

15

or extended to occupy new areas not already occupied or to "increase[] the total floor area or lot coverage," Section 921.02.A.1 of the Code, since the Lot is already built out to the full perimeter of the property on which it sits. Thus, to the extent that a special exception was needed to restripe the Parking Lot, the Board did not err as a matter of law in granting such special exception because the proposed alterations of the Lot do not "increase[] the total floor area or lot coverage," *id.*, of the Parking Lot.

(2)     Whether the Parking Lot is permitted in the NSCPO District.

Objectors argue that the proposed use of the Parking Lot is commercial in nature and, as such, is prohibited in the NSCPO District. Pursuant to Section 907.03.A of the Code, "[t]he intent of the NSCPO District is to prohibit the **installation** of commercial parking areas as defined under Sec[tion] 911.02 on **vacant lots**." (Emphasis added.) Section 907.03.B of the Code provides that "[w]hen an Occupancy Permit Application is filed for zoning approval of a commercial parking area on property located within a NSCPO District, the Zoning Administrator shall disapprove the application." The Code defines "Parking, Commercial" as "an area used or intended to be used for the off-street parking of operable motor vehicles on a **temporary basis**, other than as accessory parking to a principal use, and excluding parking structures." Section 911.02 of the Code (emphasis added).

Here, the Board found that the prohibition of commercial parking in the NSCPO District "is not applicable to the [Parking Lot] because the site is not currently vacant and the [L]ot is intended for use as an accessory off-site parking for residents in the immediate vicinity and not for commercial parking." (Board's

16

Decision, COL ¶ 3.) We agree. First, it is clear to this Court that the intended use of the Parking Lot is not for commercial parking because Applicant does not intend to use the Lot for temporary parking. Instead the Parking Lot "is intended for use as an accessory off-site parking" area. (*Id.*) We acknowledge that there was some confusion at the hearing as to whether the Parking Lot was commercial in nature. Specifically, at the hearing, the Zoning Officer testified that because the Parking Lot "is part of a lease arrangement not tied to one single owner, but several buildings, several residential uses, it's still considered commercial." (R.R. at 444a.) However, the Zoning Officer's testimony is contrary to the definition of commercial parking provided in the Code. Section 911.02 of the Code generally defines commercial parking as temporary parking. We must follow the letter of the law as defined by the Code. Therefore, because the Parking Lot is not intended for use as temporary parking we cannot conclude, as Objectors suggest, that the Parking Lot's use is commercial in nature.

Objectors also argue that the Parking Lot cannot be accessory parking and, therefore, must be commercial parking. Specifically, Objectors assert that the Parking Lot is not wholly accessory for two reasons. First, Objectors argue that because the Parking Lot is intended to be used as off-site parking for two different apartment buildings, the Lot cannot be considered accessory parking. Second, citing Lange's testimony at the hearing that only 20 of the 23 spaces would be used as accessory parking for the two apartment buildings, Objectors assert the remaining 3 spaces would be used as commercial parking; thereby making the Parking Lot, at least in part, commercial parking. However, whether the Parking Lot is indeed accessory parking is not outcome determinative. As stated above, the proposed use of the Parking Lot is not commercial in nature. The Board specifically ordered that

17

all "23 parking spaces will be used for **residential parking only**." (Board's Decision at 4 (emphasis added).) Therefore, whether the proposed use of the Lot is indeed accessory or whether the proposed use is for non-accessory residential parking is not outcome determinative. The Parking Lot is not transformed into commercial parking simply because it is not accessory. The fact remains that the Board authorized the use of the Parking Lot for "residential parking only." (*Id.*)

To the extent that Objectors are raising a substantial evidence argument because the Board found that all 23 spaces in the Parking Lot would be leased by the two apartment buildings, (Board's Decision, FOF ¶ 6), when Lange's testimony was that only 20 of the 23 spaces would be leased by the two apartment buildings, (R.R. at 451a-52a), we agree this was an error, but it does not alter the outcome. Even if three of the spaces were not used as accessory parking for the two apartment buildings but instead were leased to individuals for residential use, such an arrangement would not transform the Parking Lot into commercial parking because the three spaces would not be used as temporary parking. Therefore, under the facts of this case, where the Board specifically ordered that all "23 parking spaces will be used for residential parking only," (Board's Decision at 4), whether the Parking Lot is wholly accessory is not outcome determinative here because it is clear from the Board's Decision that the Parking Lot must be used for residential parking. The fact that the Lot may in fact contain three non-accessory residential parking spaces does not transform the use of the Parking Lot into commercial parking.

Further, even if the Parking Lot was used for commercial parking, that fact alone would not bar Applicant's ability to apply for and receive special exceptions and variances. Section 907.03.A of the Code "prohibit[s] the **installation** of commercial parking . . . on **vacant lots**." (Emphasis added.) Again, the Board found

18

that the prohibition of commercial parking in the NSCPO District "is **not applicable** to the [Parking Lot] because the site is not currently vacant and the [L]ot is intended for use as an accessory off-site parking for residents in the immediate vicinity and not for commercial parking." (Board's Decision, COL ¶ 3 (emphasis added).) Here, the Parking Lot is neither a new installation nor is the property on which it sits vacant. The property on which the Parking Lot sits has been used as a parking lot since at least 1951, (1996 Decision, FOF ¶ 6), and the Parking Lot has operated with a valid certificate of occupancy since 1998, (R.R. at 76a); therefore, under these facts it is clear the prohibition against commercial parking in the NSCPO District does not apply with respect to the Parking Lot because it is neither a new parking lot nor is the property on which it sits vacant. *See* Section 907.03.A of the Code; *see also Allegheny W. Civic Council, Inc. v. Zoning Bd. of Adjustment of the City of Pittsburgh*, 94 A.3d 450, 456 (Pa. Cmwlth. 2014) (rejecting, *inter alia*, the argument that Section 907.03.A of the Code prohibits the operation of existing commercial parking lots in the NSCPO District).

(3) Whether the Parking Lot is not in compliance with the 1998 Decision.

Objectors argue that the Parking Lot is not in compliance with several of the provisions of the Board's 1998 Decision and, therefore, the Board erred by granting this special exception. This argument is misplaced. Whether the Parking Lot is not compliant with the Board's 1998 Decision goes to the issue of enforcement. However, the Board is not the designated authority to initiate enforcement actions. Section 924.01 of the Code provides that "[t]his Code shall be enforced by the Chief of the Bureau of Building Inspection [(Chief Inspector)]." To initiate an enforcement action, the Chief Inspector must "give written notice of the nature of

19

the [zoning] violation to the owner of the land . . . after which the person receiving such notice shall have thirty (30) days to correct the violation before further enforcement action." Section 924.05.A of the Code. Section 923.02.B of the Code grants the Board the power to hear appeals from the Chief Inspector's decision, but does not grant the Board the authority to initiate enforcement actions. The record is devoid of any evidence that the Chief Inspector initiated an enforcement action regarding the Parking Lot. Therefore, whether the Parking Lot complies with the Board's 1998 Decision was not before the Board and is not relevant to the issues before this Court. Accordingly, for the foregoing reasons, the Board did not err in granting this special exception.

> B. Whether the Board erred in granting Applicant a special exception to Section 914.07.G.2 of the Code.

Objectors argue that the Board erred in granting Applicant a special exception to Section 914.07.G.2 of the Code. Specifically, Objectors argue that the Parking Lot is not the qualifying property to receive a special exception to Section 914.07.G.2 of the Code under these facts. Rather, Objectors contend that the two apartment buildings seeking to use the Parking Lot as accessory parking are the correct parties to apply for this special exception. Objectors aver that the two apartment buildings did, in fact, receive their own special exceptions to use the Parking Lot as off-site accessory parking. As such, Objectors contend the Board erred as a matter of law in granting this special exception to Applicant. Applicant responds by stating that Objectors "may [] be correct in their assertion that, [] [Applicant's] proposed parking use does not itself require [Applicant] to provide additional parking spaces for persons who park" at the two apartment buildings. (Applicant's Br. at 28 n.5 (emphasis omitted).) However, Applicant contends that

20

"there was no occasion for the [Board] to consider the special exception for offsite parking," (*id.*), which this Court reads to mean the Board had no other occasion to decide whether a special exception to Section 914.07.G.2 of the Code was needed in order to restripe the Parking Lot.

Pursuant to Section 914.07.G.2 of the Code, the Board is authorized

> to consider and approve any alternative to providing off-street parking spaces on the **site of the subject development** if the applicant demonstrates to the satisfaction of the [Board] that the proposed plan will result in a better situation with respect to surrounding neighborhoods, citywide traffic circulation and urban design than would strict compliance with otherwise applicable off-street parking standards.

(Emphasis added.) Accordingly, the Board, in accordance with Section 922.07 of the Code, is permitted to grant a special exception "to permit all or a portion of the required off-street spaces to be located on a remote and separate lot from the lot on which the **primary use** is located." Section 914.07.G.2(a) of the Code (emphasis added).

Here, the question becomes whether Applicant needs the special exception to Section 914.07.G.2 to provide off-site accessory parking for the two apartment buildings at the Parking Lot or whether the apartment buildings themselves need a special exception. We conclude, as Objectors contend and as Applicant appears to concede, that the two apartment buildings are the "subject development[s]" that require a special exception to utilize the Parking Lot as off-site accessory parking because the two apartment buildings are the "subject development[s]" seeking to provide off-street parking on a separate lot from which they are located. Section 914.07.G.2 of the Code. We further conclude that to the extent the Board erred in granting this special exception to Applicant, in addition to the two apartment

21

buildings, such error is harmless. Regardless of the Board's grant to Applicant of a special exception to provide off-site parking at the Parking Lot, the Board, as admitted by Objectors, has previously granted the two apartment buildings their own special exceptions to utilize the Lot for off-site parking. Therefore, even if the Board erred in granting Applicant this special exception, our vacating the special exception would have no practical effect because the two apartment buildings have their own special exceptions.

> C. *Whether the Board erred in granting Applicant variances to Sections 903.03.E.2 and 918.03.A of the Code.*

With respect to the two variances granted to Applicant, Objectors argue that Applicant did not meet its burden of demonstrating the conditions required to receive a variance and, therefore, the Board erred in granting the variances to Sections 903.03.E.2 and 918.03.A of the Code. Applicant responds that it did demonstrate all five conditions required for obtaining the variances. Applicant asserts that the variances merely allow Applicant to continue to operate the Parking Lot's current use, which has existed in the current condition for some time. Specifically, Applicant contends that the Parking Lot has existed with zero-foot setbacks on all sides and without screening against the buildings that abut the Parking Lot "well before the City issued the 1998 Occupancy Certificate." (Applicant's Br. at 29.)

"A variance is a departure from the exact provisions of a zoning ordinance." *S. Broad St. Neighborhood Ass'n v. Zoning Bd. of Adjustment*, 208 A.3d 539, 547 (Pa. Cmwlth. 2019). The Board cannot grant a variance unless all of the following conditions exist:

> 1. That there are unique physical circumstances or conditions, including irregularity, narrowness, or shallowness of lot size or shape, or exceptional topographical or other physical conditions

peculiar to the particular property, and that the unnecessary hardship is due to the conditions, and not the circumstances or conditions generally created by the provisions of the zoning ordinance in the neighborhood or district in which the property is located;

2. That because of such physical circumstances or conditions, there is no possibility that the property can be developed in strict conformity with the provisions of the zoning ordinance and that the authorization of a variance is therefore necessary to enable the reasonable use of the property;

3. That such unnecessary hardship has not been created by the appellant;

4. That the variance, if authorized, will not alter the essential character of the neighborhood or district in which the property is located, nor substantially or permanently impair the appropriate use or development of adjacent property, nor be detrimental to the public welfare; and

5. That the variance, if authorized, will represent the minimum variance that will afford relief and will represent the least modification possible of the regulation in issue.

Section 922.09.E of the Code. To demonstrate unnecessary hardship, Applicant must demonstrate: "(1) the physical features of the property are such that it cannot be used for a permitted purpose; [] (2) the property can be conformed for a permitted use only at a prohibitive expense; or (3) the property is valueless for any purpose permitted by the zoning ordinance." *Lamar Advantage GP Co. v. Zoning Hearing Bd. of Adjustment of the City of Pittsburgh*, 997 A.2d 423, 443 (Pa. Cmwlth. 2010).

"[T]he quantum of proof required to establish unnecessary hardship is [] lesser when a dimensional variance, as opposed to a use variance, is sought." *Hertzberg*, 721 A.2d at 48. "A dimensional variance involves a request to adjust zoning regulations to use the property in a manner consistent with regulations, whereas a

use variance involves a request to use property in a manner that is wholly outside the zoning regulations." *Tidd*, 118 A.3d at 8. Under the lesser *Hertzberg* standard, this Court may consider multiple factors when considering whether an applicant for a dimensional variance has demonstrated unnecessary hardship. These factors include: "the economic detriment to the applicant if the variance [is] denied [and] the financial hardship created by any work necessary to bring the building into strict compliance with the zoning requirements and characteristics of the surrounding neighborhood." *Hertzberg*, 721 A.2d at 50.

The burden of demonstrating the foregoing is on the applicant. *Singer v. Phila. Zoning Bd. of Adjustment*, 29 A.3d 144, 149 (Pa. Cmwlth. 2011). As we explained in *Tidd*, "[a]lthough *Hertzberg* eased the requirements, it did not remove them. An applicant must still present evidence as to each of the conditions listed in the zoning ordinance, including unnecessary hardship." *Tidd*, 118 A.3d at 8 (citation omitted).

The Board granted Applicant variances from Sections 903.03.E.2 and 918.03.A of the Code, reasoning that "the expanded and improved Parking Lot" that Applicant proposed "will have the effect of improving neighborhood conditions through the improvement of the James Street and Moravian Way frontages." (Board's Decision, COL ¶ 8.) Section 903.03.E.2 of the Code imposes lot setback requirements in high-density residential districts. Pursuant to Section 903.03.E.2 of the Code, the Parking Lot is required to maintain a minimum rear setback of 15 feet and a minimum side setback of 5 feet. Pursuant to the Board's 1998 Decision, the Parking Lot has already received a variance to have a front setback of seven feet, a south side setback of zero feet, a north side setback of three feet, and a rear setback

24

of zero feet. (1998 Decision.) Thus, Applicant is essentially asking for a variance to decrease the current variance to allow for a zero-foot setback on all sides.

The second variance is in regard to Section 918.03.A of the Code, which requires that all off-street parking areas "be screened on all sides except those sides that abut . . . other features required to be screened." Due to the configuration of the Parking Lot, this variance essentially prevents Applicant from having to erect screening against the buildings that abut the Parking Lot.

Viewing the evidence in Applicant's favor, *Tidd*, 118 A.3d at 13, we conclude there was substantial evidence to support the Board's finding that Applicant met the conditions required to receive a variance from Sections 903.03.E.2 and 918.03.A of the Code. With regard to the variance to reduce the lot setback to zero, we observe that the Parking Lot has been built out to the perimeter of the property on which it sits for some time. (Board's Decision, FOF ¶ 3.) Requiring Applicants to tear up portions of the existing Parking Lot in order for the Lot to comply with the Code's setback requirements would constitute an unnecessary hardship. *See Hertzberg*, 721 A.2d at 50. Therefore, we conclude the Board did not err in granting Applicant a variance to allow for a zero-foot setback on all sides of the Parking Lot in light of the fact that the Lot has existed with zero-foot setbacks for some time.

With regard to the variance to prevent Applicant from having to construct screening against the existing buildings that abut the Parking Lot, we conclude that literal enforcement of the Code's screening requirement would result in an unnecessary economic expense and would provide no benefit seeing that the buildings already act to screen the Lot from view. Section 918.03.A of the Code requires Parking Lots to be screened on all sides. Here, the Parking Lot is partially screened by the buildings that abut it. Requiring Applicant to erect fencing against

25

the existing buildings for the purpose of screening the Parking Lot would be unreasonable and would cause Applicant to suffer an unnecessary economic expense because the existing buildings already act to screen the Parking Lot. *See Tioga Pres. Grp. v. Tioga Cty. Planning Comm'n*, 970 A.2d 1200, 1204-05 (Pa. Cmwlth. 2009).

In *Tioga Preservation Group*, we reviewed, *inter alia*, whether the Tioga County Planning Commission erred in granting the developer of a wind farm a waiver from the county's subdivision and land development ordinance's (SALDO) screening requirement, strict application of which would require the proposed 200 foot wind turbines be screened from view. Noting that the county's SALDO allowed the planning commission to grant a waiver if literal enforcement of the SALDO would be unreasonable or would result in undue hardship, we concluded the planning commission did not err in granting the waiver. *Id.* at 1205. We reasoned that "[d]enying the waiver and requiring [developer] to construct 200-foot high fences around the [wind] turbines would unquestionably frustrate the effect of the wind turbines" and "would provide little or no additional benefit to the community." *Id.*

Like in *Tioga Preservation Group*, requiring Applicant to construct fencing against existing buildings to screen the Parking Lot would offer no benefit since the existing buildings already act to partially screen the Parking Lot. Again, requiring Applicant to construct fencing against the existing buildings would constitute an unnecessary economic expense since the Code's screening requirement is met by the existing buildings shielding the Parking Lot from view. Pursuant to the Application, the portions of the Parking Lot not abutting existing buildings will have fencing and plants to screen the Lot. Therefore, the Code's screening requirement can be accomplished without Applicant unnecessarily erecting fencing against buildings

that abut the Parking Lot. Accordingly, we conclude that the Board did not err in granting Applicant a variance from the Code's screening requirements.

### D. Whether Applicant's proposed plan violates the Code even with the relief granted by the Board.

Objectors argue that even with the relief granted by the Board, the Parking Lot violates the Code. Specifically, Objectors argue that the Parking Lot violates the Code because it: (1) is not screened; (2) does not have complying perimeter strips; (3) does not have sufficient square footage of landscaping; (4) is dilapidated; (5) is not maintained in a safe condition; (6) lacks wheel stops; (7) creates light pollution; (8) does not have a sufficiently wide center aisle; (9) lacks double-striping; and (10) lacks a site plan. Applicant responds that Objectors misunderstand the role of the Board. Applicant contends that the Board is given the authority "to decide the matters that come before it" and that the Board is not tasked with "decid[ing] whether entire plans comply with every provision of the Code." (Applicant's Br. at 33.)

Like Objectors' arguments regarding the Parking Lot not being in compliance with the 1998 Decision, Objectors arguments here are misplaced because they go to the issue of enforcement. As stated above, the Chief Inspector is tasked with enforcing the Code. The Board's role in enforcement actions is limited to hearing appeals from decisions of the Chief Inspector. Here, there is no evidence of record that the Chief Inspector issued an enforcement notice with respect to the Parking Lot. As such, whether the Parking Lot is in violation of various sections of the Code was not before the Board. Therefore, Objectors' arguments regarding the Parking Lot being compliant with the Code are not relevant to the issues before this Court.

27

### III. Conclusion

For the foregoing reasons, we hereby affirm common pleas' affirmance of the Board's grant of special exceptions to Sections 921.02.A.1 and 914.07.G.2 of the Code and the Board's grant of variances from Sections 903.03.E.2 and 918.03.A of the Code.

_____
**RENÉE COHN JUBELIRER,** Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Stephen Pascal, Chris Gates, and    :
Barbara Burns,    :
              Appellants    :
    :
          v.    :   No. 337 C.D. 2019
    :
City of Pittsburgh Zoning Board of    :
Adjustment, James Street Parking LLC,  :
Sean Lange and Morgan Kronk, and    :
City of Pittsburgh and James Street    :
Parking, LLC    :

# **O R D E R**

    **NOW**, April 8, 2020, the Order of the Court of Common Pleas of Allegheny County in the above-captioned matter is hereby **AFFIRMED.**

                                  _____
                                    **RENÉE COHN JUBELIRER,** Judge